1
2
3
4

MARK W. ROBERTSON (S.B. No. 200220)
mrobertson@omm.com
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY  10036
Telephone:      (212) 326-2000
Facsimile:      (212) 326-2061

5
6
7
8

SHARON M. BUNZEL (State Bar No. 181609)
sbunzel@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

9
10

Attorneys for Third Party
Korn/Ferry International

11

**UNITED STATES DISTRICT COURT**

12

**NORTHERN DISTRICT OF CALIFORNIA**

13

**SAN FRANCISCO DIVISION**

14
15
16
17
18
19
20

UNITED STATES OF AMERICA,

              Plaintiff,

    v.

DAVID NOSAL,

           Defendant.

Case No.  CR-08-0237-EMC

**DECLARATION OF MARLENE BRISKI**

21
22
23
24
25
26
27
28

1

**DECLARATION OF MARLENE BRISKI**

2

I, Marlene Briski, declare and state as follows:

3

1.      I have personal knowledge of the facts set forth in this declaration and, if called to

4

testify as a witness, could and would testify competently to the facts set forth below.

5

2.      I am employed by Korn/Ferry International ("Korn/Ferry"), as its Vice President

6

Information Services.  I have held this position since November 2002.  I have been employed by

7

Korn/Ferry since September 1980.

8

3.      My declaration is organized in three sections.  In Section A, I address the time that

9

I have spent investigating David Nosal's ("Nosal's") theft of information from Korn/Ferry, and

10

assisting the government in its investigation and subsequent prosecution of Nosal.  In Section B, I

11

address the time that Dan Demeter spent investigating Nosal's theft of information from

12

Korn/Ferry, and assisting the government in its investigation and subsequent prosecution of

13

Nosal.  In Section C, I address the value of the source lists and contact information of additional

14

executives in Korn/Ferry's Searcher database that is referenced in the February 28, 2013 Second

15

Superseding Indictment filed by the government against Nosal in this matter.

16

17

**A.      Time Spent On Investigating Data Theft And Assisting The Government In Its Investigation And Subsequent Prosecution Of David Nosal.**

18

4.      In March 2005, Korn/Ferry asked me to determine whether there was any

19

indication that Nosal was engaged in search work, or any other unusual activity by Nosal, or his

20

former assistant who had remained at Korn/Ferry after his departure, Jacqueline Froehlich-

21

L'Heureaux.  I spent approximately ten hours in March 2005 reviewing Ms. Froehlich-

22

L'Heureaux's use of Korn/Ferry's Searcher database.

23

5.      In April 2005, I continued to investigate whether Nosal was engaged in any

24

activity that was suspicious.  I spent approximately 90 hours in April 2005 analyzing possible

25

search activity by Nosal, including information regarding potential board positions at companies,

26

placements of Chief-level officers, and publicly-available articles and information.  In late April,

27

however, based on the discovery of certain e-mails, the focus of the investigation began to change

28

and started to focus on whether there was a theft of data from Korn/Ferry.

DECLARATION OF MARLENE BRISKI,
CR-08-0237-EMC

6.      On May 3, 2005, I, along with Dan Demeter, Korn/Ferry's then Chief Information Officer, uncovered evidence of significant downloads of source lists from Searcher by former employees Mark Jacobson and Becky Christian immediately prior to their separation from Korn/Ferry.  Based on e-mails uncovered earlier in the investigation, we concluded that Mr. Jacobson and Ms. Christian were part of a team working with Nosal surreptitiously to establish an executive search firm with Nosal.

7.      As a result, I was tasked by Mr. Demeter with attempting to determine whether any Korn/Ferry employees were using their access to Searcher to assist Nosal and to identify what information they (or any prior employees, including Mr. Jacobson and Ms. Christian) downloaded from Searcher to do so.  I spent approximately 80 hours in May 2005 downloading reports of Searcher activity for individuals with connections to Nosal whom Korn/Ferry believed were the most likely candidates to be assisting Nosal in making intrusions into Searcher, as well as monitoring Searcher, and analyzing their activity on Searcher.  As part of this work, I prepared various charts and graphs regarding Searcher activity to show to my superiors at Korn/Ferry— some of which were ultimately used at the criminal trial.  I also worked to develop and implement additional audit capabilities in the Searcher database that allowed Korn/Ferry to capture additional information regarding queries run and other Searcher activity by individuals using Searcher.

8.      In June 2005, I continued to monitor Searcher in an attempt to determine if any current employees were using their access to Searcher to assist Nosal and to identify what information they downloaded from Searcher to do so.  I spent approximately 120 hours in June 2005 monitoring Searcher, analyzing reports of Searcher downloads generated on June 3 and June 23, running various queries and searches in Searcher attempting to find connections between the downloaded data, and summarizing the findings of that analysis.  I also continued my work of developing and implementing new audit capabilities in the Searcher database.

9.      In July 2005, I spent approximately 120 hours on work related to the theft of data in Korn/Ferry's Searcher's database by Nosal and his co-conspirators.  This included monitoring Searcher activity, analyzing reports of Searcher downloads generated on July 12 and July 29,

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

1    recreating the steps taken by Nosal and his co-conspirators to download information from

2    Korn/Ferry, and doing write-ups and analysis of my findings.  My work in July included assisting

3    with preparing for potential civil litigation and arbitration.  Korn/Ferry commenced civil litigation

4    in August 2005, and for the remainder of 2005, the bulk of my time was spent assisting on that

5    litigation.

6         10.     In September 2005, the government requested an estimate of the time that

7    Korn/Ferry employees had spent responding to the data thefts.  In response, I created a document

8    setting forth a list of the tasks I had performed from March through September 2005.  I used this

9    document to refresh my memory in connection with preparing this declaration.  A true and correct

10   copy of the document I created in September 2005 is attached hereto as Exhibit A.  In total, from

11   March to September 2005, I estimate that I spent a total of 575 hours.  The time included on

12   Exhibit A includes the time that I spent assisting Korn/Ferry with the related civil litigation and

13   arbitration.  My estimate set forth below, however, does not include any time spent on the related

14   civil litigation and arbitration.

15        11.     Since Korn/Ferry reported this matter to the government in July 2005 until the

16   present, I have regularly assisted the government in its investigation and subsequent prosecution

17   of Nosal.  In addition to the activities described above for July to September 2005, I have also

18   participated in numerous telephone and in-person meetings with the US Attorney's Office for the

19   Northern District of California ("USAO") and the Federal Bureau of Investigation ("FBI").

20   Many of these telephone conferences and in-person meetings were to discuss and understand

21   Korn/Ferry's Searcher database, the measures Korn/Ferry takes to safeguard it, and the specific

22   source lists stolen by Nosal and his co-conspirators.  This has involved trips to San Francisco to

23   meet with the USAO and FBI, as well as meetings in Los Angeles with the USAO and FBI at

24   Korn/Ferry's offices.  I also participated in many internal meetings at Korn/Ferry, often with Dan

25   Demeter.  In addition, I have responded to numerous requests for information from the USAO

26   and FBI.  It is my understanding that many of these requests for information, data, and documents

27   arose from allegations that Nosal made against Korn/Ferry during the course of the government's

28   investigation.  I also reviewed Searcher and Citrix logs to recreate events, including how Searcher

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

1   was accessed and the specific data that was taken from it.  I have also run searches for and

2   reviewed potentially responsive documents to multiple subpoenas issued by the government and

3   Nosal in the criminal matter.  Finding responsive documents and information often required me to

4   review significant amounts of data and documents, and create specific queries.

5          12.     I also testified before the grand jury in this matter and met with the USAO and FBI

6   in advance of testifying before the grand jury.  Similarly, I was a witness in the criminal trial and

7   attended meetings with the USAO and FBI in advance of testifying in the criminal trial.

8   Following the criminal trial, I attended the October 9, 2013 sentencing hearing.  I have also

9   assisted in analyzing and valuing the data taken by Nosal and his co-conspirators and further

10  worked to determine the amount of time spent on this matter.

11         13.     In order to estimate the amount of time that I have spent on this matter, I have

12  reviewed my Outlook calendar, reviewed e-mail correspondence, and reviewed various other

13  documents related to this matter.  I also reviewed information from AtTask, a project

14  management software that Korn/Ferry used from May 2012 to April 2013 to track time spent on

15  projects.  I also reviewed information from an internally developed Excel-based project time

16  tracking system that Korn/Ferry has used from April 2013 to the present.  Based on that review, I

17  estimate that, from July 2005 to the present, I have spent a total of approximately 325 hours

18  assisting the government in its investigation and subsequent prosecution of Nosal.  This estimate

19  does not include the additional time that I estimate I have spent on the civil litigation between

20  Korn/Ferry and Nosal and certain other former employees (which was concluded in May 2006) or

21  the arbitration between Korn/Ferry and Nosal (which has been stayed since March 2007).

22         14.     The breakdown of my estimated hours is as follows:  approximately 15 hours from

23  July to December 2005; approximately 40 hours in 2006; approximately 30 hours in 2007;

24  approximately 40 hours in 2008; approximately 20 hours in 2009; approximately 20 hours in

25  2010; no hours in 2011; no hours in 2012; and approximately 160 hours to date in 2013.

26         15.     Because I did not keep precise track of my time and this matter has been ongoing

27  for more than eight years, this is an estimate only.  I believe, however, that this is a conservative

28  estimate and that I likely spent more time than I have listed.

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

**B.    Time Spent By Dan Demeter On Investigating Data Theft And Assisting The Government In Its Investigation And Subsequent Prosecution Of David Nosal.**

16.    Dan Demeter worked at Korn/Ferry from April 1996 through August 2010, when Mr. Demeter suffered a severe stroke.  Accordingly, I am providing an estimate of Mr. Demeter's time spent on this matter.

17.    From April 1996 until his separation from Korn/Ferry following his stroke, Mr. Demeter was the Chief Information Officer of Korn/Ferry.  In my role as Vice President Information Services, I reported directly to Mr. Demeter, and worked very closely with Mr. Demeter until his separation from Korn/Ferry in investigating the theft of data at issue in this matter and assisting the government in its investigation and subsequent prosecution of Nosal.  Mr. Demeter and I frequently discussed the activities that both of us were performing related to the government's investigation and subsequent prosecution of Nosal.

18.    In September 2005, when I prepared the estimate of my time spent on this matter at the request of the government, I also worked with Mr. Demeter to estimate his time.  At that point, we estimated that Mr. Demeter had spent 400 hours from March to September 2005, managing the Information Technology group's role in the investigation, and monitoring the computer activities of individuals, and in particular, Ms. Froehlich-L'Heureaux.

19.    I estimate that Mr. Demeter approximately 70 hours in May 2005 investigating theft of data from Korn/Ferry by Nosal and the co-conspirators in this matter.

20.    I estimate that Mr. Demeter approximately 70 hours in June 2005 investigating theft of data from Korn/Ferry by Nosal and the co-conspirators in this matter.

21.    I estimate that Mr. Demeter spent approximately 120 hours in July 2005 investigating theft of data from Korn/Ferry by Nosal and the co-conspirators in this matter.  Mr. Demeter's work in July included assisting with preparing for potential civil litigation and arbitration.

22.    In order to estimate the amount of time that Mr. Demeter has spent on this matter, I reviewed his Outlook calendar, e-mail correspondence, and numerous other documents related to this matter.  Based on that review, I estimate that, from July 2005 to his separation from

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

1  Korn/Ferry, Mr. Demeter spent a total of approximately 140 hours assisting the government in its

2  investigation and subsequent prosecution of Nosal.  This estimate does not include the additional

3  time that I estimate Mr. Demeter spent on the civil litigation between Korn/Ferry and Nosal and

4  certain other former employees (which was concluded in May 2006) or the arbitration between

5  Korn/Ferry and Nosal (which has been stayed since March 2007).

6      23.      The breakdown of my estimate of Mr. Demeter's hours is as follows:

7  approximately 80 hours from July to December 2005; approximately 10 hours in 2006;

8  approximately 5 hours in 2007; approximately 10 hours in 2008; approximately 10 hours in 2009;

9  and approximately 25 hours in 2010.

10     24.      Because I did not track Mr. Demeter's time, and this matter has been ongoing for

11  more than eight years, this is an estimate only.  I believe, however, that this is a conservative

12  estimate.  Indeed, because I am making an estimate for Mr. Demeter, I have taken a very

13  conservative approach and believe that it is likely that Mr. Demeter spent significantly more time

14  than I have listed.

15     25.      In addition to Mr. Demeter, several other employees in the Information

16  Technology group at Korn/Ferry worked on Korn/Ferry's investigation of data theft and assisted

17  me and Mr. Demeter in responding to the government's requests for information during its

18  investigation and subsequent prosecution of Nosal.  I have not, however, attempted to provide an

19  estimate of their time.

20
21  **C.      Valuation Of The Source Lists And Other Executive Names And Information
         Referenced In The Second Superseding Indictment.**

22  **Information/Data Referenced In The Second Superseding Indictment**

23     26.      I have been informed that the source lists referenced in Paragraphs 19(a) and 19(b)

24  of the February 28, 2013 Second Superseding Indictment (the "Indictment") are contained in

25  Government Exhibit 58.  I have reviewed Government Exhibit 58, which contains three source

26  lists containing contact information for 349 executives.

27     27.      I have been informed that the information regarding the six Chief Financial

28  Officers referenced in Paragraph 19(c) of the Indictment is contained in Government Exhibit 65.

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

1    I have reviewed Government Exhibit 65, which contains contact information for six Chief

2    Financial Officers obtained from a source list.

3        28.    I have been informed that the information regarding approximately 65 executives

4    referenced in Paragraph 19(f) of the Indictment, as well as the source list referenced in Paragraph

5    19(f) of the Indictment are contained in Government Exhibit 43.  I have reviewed Government

6    Exhibit 43, which contains a spreadsheet with 63 executives and their contact information.  I note

7    that the first two entries on the spreadsheet state "Null" but contain numbers for "Exec ID."  At

8    the time this spreadsheet was downloaded, however, these "Null" entries had contact information

9    for two additional executives.  Searcher is a database that is used on a daily basis and sometimes a

10   record is entered multiple times, which is what happened here.  Specifically, based on the "Exec

11   ID" numbers, I know that the two executives were merged with other records, one in September

12   2005, and one in April 2006.  Government Exhibit 43 also contains a source list with contact

13   information for 85 executives.  Thus, the incident referenced in Paragraph 19(f) of the Indictment

14   involved contact information for a total of 150 executives (85 of whom were on a source list).

15       29.    I have been informed that the two e-mails referenced in Paragraph 19(g) of the

16   Indictment are contained in Government Exhibit 60.  I have reviewed Government Exhibit 60,

17   which contains contact information for 33 executives on two e-mails, some of which are

18   duplicates.  Excluding the duplicate names and contact information on the two e-mails,

19   Government Exhibit 60 contains contact information for 25 executives, which were "cut and

20   pasted" from a source list.

21       30.    I have been informed that Government Exhibit 23 contains the list of source lists

22   downloaded by Becky Christian that are referenced in Paragraph 19(j) of the Indictment.  In

23   addition the government provided me with copies of the source lists obtained from Ms. Christian

24   as part of its investigation.  I have reviewed those source lists as compared to Government Exhibit

25   23, and positively identified 23 source lists as matching the source lists on Government Exhibit

26   23.  Those 23 sources lists contain contact information for a total of 2,784 executives.

27       31.    In connection with the May 3, 2005 incident described in Paragraph 19(k) of the

28   Indictment, I have been informed that the government did not present evidence regarding this

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

incident.  Accordingly, these 19 executives are not included in my below valuation.

32.     In connection with the May 26, 2005 incident described in Paragraph 19(l) of the Indictment, it is my understanding that the names of these 17 individuals are included in Government Exhibit 27, which I have reviewed.  The government, however, did not provide me with any information regarding its conclusion as to which of these 17 individuals Ms. Froehlich-L'Heureaux actually obtained from Searcher in response to the e-mails from Mark Jacobson in Government Exhibit 27.  I reviewed Korn/Ferry's records and determined that Ms. Froehlich-L'Heureaux obtained resumes from Korn/Ferry for 13 of these individuals and provided them to Mr. Jacobson.  Accordingly, only 13 of these individuals are included in my valuation below.

33.     I have been informed that the Custom Report referenced in Paragraph 19(m) of the Indictment is contained in Government Exhibit 33.  I have reviewed Government Exhibit 33, which contains contact information for 365 executives.  This was re-created from Searcher and based on my review of other records, I have determined that the spreadsheet contained contact information for 366 executives at the time it was taken, as noted in the Indictment.

34.     I have been informed that the 25 source lists referenced in Paragraph 19(n) of the Indictment are contained in Government Exhibit 47.  I have reviewed Government Exhibit 47, which contains 25 source lists with contact information for 3,490 executives.  Of these 25 sources lists, two are duplicates of source lists taken in April 2005 (as referenced in Paragraphs 19(a) and (b) of the Indictment), and eight are duplicates of source lists taken in December 2004 (as referenced in Paragraph 19(j) of the Indictment).  Excluding the ten duplicates, the 15 source lists contain contact information for a total of 2,406 executives.

35.     Accordingly, the below valuation that I describe values the contact information for a total of 6,099 executives, the vast majority of whom (5,649) are from 43 source lists.  Specifically, this includes the value of the contact information for: (i) 349 executives contained in Government Exhibit 58, and described in Paragraphs 19(a) and 19(b) of the Indictment; (ii) six executives contained in Government Exhibit 65 and described in Paragraph 19(c) of the Indictment; (iii) 150 executives contained in Government Exhibit 43, and described in Paragraph 19(f) of the Indictment; (iv) 25 executives contained in Government Exhibit 60, and described in

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

1   Paragraph 19(g) of the Indictment; (v) 2,784 executives contained in source lists provided to me

2   by the government as listed in Government Exhibit 23, and described in Paragraph 19(j) of the

3   Indictment; (vi) 13 executives contained in Government Exhibit 27, and described in Paragraph

4   19(l) of the Indictment; (vii) 366 executives contained in Government Exhibit 33, and described

5   in Paragraph 19(m) of the Indictment; and (viii) 2,406 executives contained in Government

6   Exhibit 47, and described in Paragraph 19(n) of the Indictment.

7   **Valuation Of The Information/Data Referenced In The Second Superseding Indictment**

8           36.      I believe it would be very time-consuming to attempt to determine the amount of

9   money spent by Korn/Ferry to develop information regarding each of the specific 6,099

10  executives at issue in the Indictment.  To do that, Korn/Ferry would be required to analyze the

11  history of each of the 6,099 Searcher entries for each executive to determine when the executive

12  was added to Searcher, who added the executive, whether the information regarding the executive

13  was modified (and, if so, when and by whom), determine how much time was spent at each stage

14  for that entry, and multiply that amount by the compensation rate paid to each employee involved.

15  Accordingly, I have estimated the average amount spent by Korn/Ferry to develop information

16  regarding an executive in the Searcher database and an executive included on a source list in 2005

17  to ascertain the value of the contact information for the 6,099 executives described above.

18          37.      Korn/Ferry employees at all levels (e.g., research associates, senior associates,

19  client partners, and senior client partners) identify executives for inclusion in Searcher.

20  Korn/Ferry also sometimes hires search consultants to identify executives for inclusion in

21  Searcher.  For purpose of this analysis, I am conservatively assuming that all of the 6,099

22  executives at issue were identified and added to Searcher by search consultants or standard

23  research associates.  In 2005, based on my knowledge of the work performed by search

24  consultants and standard research associates and information from my colleagues, search

25  consultants or standard research associates could typically generate contact information for two to

26  four executives worthy of inclusion in Searcher per hour.  In 2005, based on my review of

27  Korn/Ferry's agreements with search consultants, Korn/Ferry typically paid search consultants

28  approximately $100.00 per hour.  And, based on my review of Korn/Ferry documents regarding

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

1    compensation, benefits, and overhead, the cost to Korn/Ferry of a standard research associate in

2    2005 was approximately $150.00 per hour.  Thus, the low end cost of generating contact

3    information for 6,099 executives for inclusion in Searcher in 2005 is $152,475.00 (multiplying

4    .25 by 6,099 by $100.00), and the high end cost is $457,425.00 (multiplying .5 by 6,099 by

5    $150.00)—with a mid-point of $304,950.00.  This equals an average cost of $50.00 per executive.

6        38.    This estimated cost of $304,950.00 or $50.00 per executive is only the cost of

7    getting the contact information for these 6,099 executives into Searcher.  But the contact

8    information at issue in the Indictment is not simply contact information for random executives in

9    Searcher.  Rather, of the 6,099 executives at issue, 5,649 were on 43 specific source lists, which

10   contained the executive candidates that Korn/Ferry employees identified for particular positions

11   in particular industries.  These are described in paragraphs 19(a), (b), (f), (g), (j), and (n) of the

12   Indictment.  As detailed below, to ascertain the total value of the information taken, the value of

13   the work of developing the 43 sources lists also has to be taken into account.

14       39.    When a client retains Korn/Ferry to perform a search for an executive, Korn/Ferry

15   often creates a source list of potential candidates using the customers' search criteria to locate

16   qualified individuals whose names and information are stored in the Searcher database.  The

17   purpose of the source list is to narrow the entire universe of potential candidates whose

18   information is available to Korn/Ferry to a limited number of candidates with the training, skills,

19   and experience most closely aligned with the job specifications provided by Korn/Ferry's client.

20   As such, the source list should contain the best candidates for a specific job specification in a

21   specific industry.

22       40.    A Korn/Ferry source list created for one client can be used by an executive

23   recruiter attempting to fill the same or a similar position in the same or similar industry.  For

24   example, a privately-held, mid-sized technology company located in Silicon Valley might retain

25   Korn/Ferry to search for a Chief Financial Officer, and ultimately might hire one of the

26   candidates on the source list Korn/Ferry prepares.  The remaining candidates on the source list,

27   who were not hired, are nevertheless highly qualified candidates for a Chief Financial Officer at

28   another privately-held, mid-sized technology company located in Silicon Valley.

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

41.     The work of determining the executives to place on a source list is typically performed by Senior Associates, Client Partners, and Senior Client Partners.  Indeed, in some cases, the entire source list is compiled by Partners or Senior Client Partners.  But for purposes of this analysis, I am conservatively assuming that all of the work for the 43 source lists at issue was performed by Senior Associates.  In 2005, the cost to Korn/Ferry for Senior Associates (including compensation, benefits, and overhead) was approximately $200 to $250 per hour.  Based on my experience at Korn/Ferry and information obtained from my colleagues at Korn/Ferry, I believe a conservative estimate of the time it takes to conduct the work required to locate and initially evaluate an individual candidate for inclusion on a source list (e.g., by reviewing other source lists, searching for executives in Searcher, and reviewing documents and notes of each executive) is an average of .25 to .33 of an hour (i.e., three to four executives per hour).  Thus, the low end cost of finding 5,649 executives for 43 source lists is $282,450.00 (multiplying .25 by 5,649 by $200.00), and the high end cost is $466,042.50 (multiplying .33 by 5,649 by $250.00)—with a midpoint of $374,246.25.

42.     This brings the total estimated value of the contact information for 6,099 executives, including 5,649 on source lists to $679,196.25 ($304,950.00 (as detailed in Paragraph 37) + $374,246.25 (as detailed in Paragraph 41)).  This brings the total estimated cost of the contact information of an executive on a source list to $116.25 ($50.00 + $66.25) per executive.

43.     The estimate of the total value of the information taken of $679,196.25 is conservative given Korn/Ferry's estimated aggregate spend on compensation attributable to adding executives and information regarding such executives to Searcher each year.  Based on my review of relevant documents, I estimate that Korn/Ferry spent $15,730,084.50 in compensation costs in 2005 for time spent by its employees in North America adding executives and information regarding executives to Searcher.  Most Korn/Ferry employees, but not all, use the Searcher database.  Using the June 2005 headcount report for Korn/Ferry North America, and based on my knowledge of Searcher use, I estimate the following Searcher users by role:  60% of the 153 Senior Client Partners/Vice Presidents; 75% of the 53 Principals; 90% of the 124 Senior Associates/Associates; 95% of the 39 Researchers; 12% of the 31 Corporate Professionals; and

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

1    50% of the 177 Administrative Support personnel.  Based on my knowledge of the work

2    performed by individuals in these roles and my review of Searcher activity, I estimate that the

3    Senior Client Partners/Vice Presidents who used Searcher spent approximately 25% of their time

4    using Searcher; the Principals who used Searcher spent approximately 50% of their time using

5    Searcher; the Senior Associates/Associates who used Searcher spent approximately 75% of their

6    time using Searcher; the Researchers who used Searcher spent approximately 95% of their time

7    using Searcher; the Corporate Professionals who used Searcher spent approximately 75% of their

8    time using Searcher; and the Administrative Support personnel who used Searcher spent

9    approximately 50% of their time using Searcher.  I further estimate, however that only a portion

10   of that time was spent adding contact information regarding executives and/or information about

11   executives to Searcher.  Specifically, based on my knowledge of the work performed by

12   individuals in these roles and my review of Searcher activity, I estimate that, of the hours spent

13   using Searcher, Senior Client Partners/Vice Presidents spent only 10% of that time adding

14   executives or information regarding executives to Searcher; Principals spent 25% of that time

15   doing so; Associates spent 60% of that time doing so; Researchers spent 75% of that time doing

16   so; Corporate Professionals spent 25% of that time doing so; and Administrative Support

17   personnel spent 50% of that time doing so.  This results in the following number of hours spent

18   adding executives or information regarding executives to Searcher in 2005 as follows: 4,758

19   hours of senior Client Partner/Vice President time; 10,355 hours of Principal time; 104,458 hours

20   of Senior Associates/Associate time; 54,908 hours of Researcher time; 1,427 hours of Corporate

21   Professional time; and 46,020 hours of Administrative Support time.  And in 2005, Korn/Ferry

22   added 149,063 executives to its Searcher database.  Dividing Korn/Ferry's estimated aggregate

23   spend on compensation for adding executives and information about executives to Searcher in

24   2005 by the number of executives added to Searcher in 2005 (i.e., dividing $15,730,084.50 by

25   149,063) results in an estimated cost of $105.53 per executive.  And multiplying 6,099 by

26   $105.53, produces an estimated cost of $643,627.47.  This method of valuation results in a

27   significantly higher cost of adding contact information for 6,099 executives to Searcher than the

28   method described in Paragraph 37 because it considers the compensation costs for all levels of

- 12 -

DECLARATION OF MARLENE BRISKI
CR-08-0237-EMC

1   employees using Searcher, rather than conservatively assuming that all of the work was

2   performed by search consultants and standard research associates.

3       44.     The estimate of the total value of the information taken of $679,196.25 is also

4   conservative given the revenues generated by the 43 executive searches that were completed with

5   the 43 sources lists at issue.  Each of the 43 source lists at issue were for actual executive searches

6   that Korn/Ferry conducted.  And Korn/Ferry collected an average fee of $101,698.00 for the 43

7   searches associated with those source lists, for a total of $4,373,014.00 in fees.  Based on my

8   experience and information from my colleagues, I believe that a conservative estimate is that 15%

9   of a search team's total time spent when conducting an executive search is spent finding

10  executives with the right qualifications to include on the source list and present to the client.

11  Thus, allocating 15% of the fees for the 43 searches to the time spent developing the 43 source

12  lists equals $655,952.10.

      I declare under penalty of perjury under the laws of the United States of America that the

13

14  foregoing is true and correct.

15      Executed this 11th day of November 2013, at Los Angeles, California.

16

17                                              _Marlene Briski_

18                                              Marlene Briski

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MARLENE BRISKI
                                              CR-08-0237-EMC

# Exhibit A

March: 10 hours
- JFL's current activity on Searcher (Custom Reports, Notes, Engagements)
- JFL's Searcher activity on leave

April: 90 hours
DN executive search activity analyzed against:
- Potential board positions at companies
- C suite placements
- Prospective Sandra Horn
- Articles on line and on the Internet post KF
- UTStarcom timeline
- 4-12 downloads

May:   80 hours
- Downloads of key people & other possibilities
- Training stats
- URS information
- Monitoring Searcher & utilizing new queries

June:  120 hours
- Monitoring Searcher & utilizing new queries
- 6-3, 6-23 downloads write-ups
- Name corroboration
- Possible Source List Match from previous thefts

July:  120 hours
- Monitoring Searcher & utilizing new queries
- 7-12, 7-29 downloads
- Recreating steps to downloads
- Write-ups of above scenarios
- Name corroboration

August: 140 hours
- Resume downloads
- Recreating 6-3 & 6-23 reports
- DN engagements B&C
- SF & SV office folks
- People in the firm
- Company list for subpoena
- BD Notes on TPG & other companies
- General information requests
- Recreating 7-29 reports

September:  15 hours
- Recreating 7-29 reports
- Declaration
- 7-12 & CR reports