**United States District Court**
For the Northern District of California

1
2
3
4
5                        UNITED STATES DISTRICT COURT

6                       NORTHERN DISTRICT OF CALIFORNIA

7

8   UNITED STATES OF AMERICA,                    No. CR-08-0237 EMC

9              Plaintiff,

10        v.                                     **ORDER REGARDING THE**
                                                 **CALCULATION OF LOSS FOR**
11  DAVID NOSAL,                                 **PURPOSES OF THE GUIDELINES**

12             Defendant.
    _____/
13

14

15                          **I.    INTRODUCTION**

16        On April 24, 2013, a jury convicted Defendant David Nosal of three counts of computer

17  fraud in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(4), two

18  counts of unauthorized downloading, copying, and duplicating of trade secrets without

19  authorization, in violation of the Economic Espionage Act ("EEA"), 18 U.S.C. § 1832(a)(2), and one

20  count of conspiring to violate the EEA.  In their sentencing memoranda, the government and

21  Defendant disputed – among other things – what the "actual loss" resulting from defendant's actions

22  was for purposes of U.S.S.G. § 2B1.1.  This order memorializes the Court's reasoning expressed at

23  the sentencing hearing held on January 8, 2014.  For the reasons stated on the record at that hearing

24  as well as in this order, the Court  finds that the actual loss figure includes (1) the costs incurred by

25  Korn/Ferry International ("KFI") in responding to defendant's actions and (2) the development costs

26  of the source lists stolen from KFI in furtherance of the conspiracy.  Accordingly, the Court

27  concludes that a reasonable estimate of KFI's actual loss based on the record before the Court is

28  **$46,907.88**, thus warranting a six level increase in Defendant's offense level.

## II.   FACTUAL AND PROCEDURAL HISTORY

Defendant is a former high-level employee of KFI, an executive search firm with offices around the world.  Second Superseding Indictment ("SSI") ¶¶ 1-2.  The company is a leading provider of executive recruitment services, assisting companies to fill executive and other high level positions.  *Id.* ¶ 1.  Defendant worked for KFI from approximately April 1996 until October 2004.  *Id.* ¶ 2.  When he ceased his employment with the firm, he entered into Separation and General Release Agreement, and an Independent Contractor Agreement with KFI.  *Id.* ¶ 2.  In these agreements, he agreed to serve as an independent contractor to KFI from November 1, 2004 through October 15, 2005.  *Id.* ¶ 2.  He also agreed not to perform executive search or related services for any other entity during the term of his contract.  *Id.* ¶ 2.  In return, he received compensation in the amount of $25,000 per month.  *Id.* ¶ 2.  Despite these agreements, Defendant began to set up his own rival executive search firm with the assistance of three other current or former KFI employees: B.C., J.F.L., and M.J.  *Id.* ¶¶ 3-5.[1]  J.F.L. was Defendant's assistant while he was a Korn/Ferry employee, and continued to be employed by Korn/Ferry after Defendant's departure.  *Id.* ¶ 4.  B.C. was a KFI employee until approximately January 2005.  *Id.* ¶ 3.  M.J. was a Korn/Ferry employee until approximately March of 2005.  *Id.* ¶ 5.

The second superseding indictment charges Defendant with three counts of obtaining unauthorized access to a protected computer with intent to defraud and obtaining something of value in violation of the CFAA.  *Id.* ¶ 20-21.  The counts are based on three occasions in which J.F.L.'s KFI username and password were used to access KFI's Searcher database.  *Id.* ¶ 20-21.  The three incidents took place on April 12, 2005, July 12, 2005, and July 29, 2005.  *Id.* ¶ 21.  On each occasion, the person accessing Searcher downloaded information from the database, including source lists of candidates KFI had compiled for previous search assignments.  *Id.* ¶ 21.  The government alleges that these searches were performed not by J.F.L., but by B.C. and M.J., neither of whom were KFI employees at the time.  *Id.* ¶ 19.

---

[1] The enforceability of the non-compete agreements is not an issue for this Court to decide.

**United States District Court**
For the Northern District of California

1    The second superseding indictment also charges Defendant with unauthorized downloading,

2    copying, and duplicating of trade secrets, as well as unauthorized receipt and possession of trade

3    secrets, all in violation of the EEA.  *Id.* ¶ 22-24.  These charges were based on three specific source

4    lists and one set of information drawn from a source list, all of which B.C. obtained from Searcher

5    and emailed to Defendant.  Finally, Defendant was charged with conspiracy to commit the CFAA

6    and EEA violations.  *Id.* ¶¶ 12-19.

7    A jury convicted Defendant on all counts on April 23, 2013.  Dkt. No. 408.  At the initial

8    sentencing hearing held on October 9, 2013, the Court ordered the parties to file supplemental

9    briefing regarding the calculation of the loss (for purposes of calculating the advisory Sentencing

10   Guidelines range) caused by Defendant's conduct as well as the proper amount of the restitution

11   award under the Mandatory Victim Restitution Act.

12   In its supplemental brief, the government argues that the Court should consider (1) the costs

13   KFI incurred responding to Defendant's violations of the CFAA and (2) the development costs of

14   the trade secrets (the source lists) Defendant stole from KFI in calculating "loss" for purposes of the

15   Guidelines.  Regarding response costs, the government asserts that beginning in May 2005, KFI

16   employees began investigating whether Defendant had stolen data from KFI's systems, the scope of

17   such theft, and whether KFI personnel had participated.  United States' Supplemental Sentencing

18   Memorandum ("Gov. Supp. Memo.") at 8-12, Dkt. No. 476.  The government further argues that

19   given the substantial time spent creating the source lists, the development costs of these lists should

20   be estimated between $434,925.00 and $923,467.50.  Declaration of Marlene Briski ("Briski Decl.")

21   ¶ 41.

22   Defendant challenges the inclusion of KFI's response costs in the loss calculation and asserts

23   that the government has failed to demonstrate that the development costs or fair market value of the

24   downloaded source lists exceeded $5,000.  First, Defendant argues that KFI's internal investigative

25   costs cannot be considered a "response cost" under the Sentencing Guidelines' definition of loss.

26   Defendant's Supplemental Memorandum on Loss ("Def. Supp. Memo.") at 7, Dkt. No. 489.

27   Assuming that such investigatory costs are properly considered, Defendant next asserts that the

28

3

United States District Court

For the Northern District of California

1    government has failed to demonstrate that these costs were "caused" by Defendant's actions or that

2    the costs were "reasonably necessary." *Id.* at 9-10.

3          Additionally, Defendant raises a number of challenges to the government's estimate of the

4    development costs of the source lists.  First, Defendant argues that only the source lists/information

5    expressly referenced in Counts Five and Six can be considered for purposes of the loss calculation.

6    *Id.* at 4, 12.  Second, the Defendant asserts that Ms. Briski and the government have drastically

7    overestimated the hourly rate of KFI employees and the amount of time it takes to add executives'

8    information into the Searcher database or create source lists.  For example, while Ms. Briski

9    estimates that it takes at least 15 minutes to enter *one* executive's information into the Searcher

10   database, Defendant introduces declarations demonstrating that multiple executives could be entered

11   to Searcher *per minute* through a variety of automated data entry mechanisms.  *See, e.g.*, Declaration

12   of Susan Oliver ("Oliver Decl.") at 3-4, Declaration of Karen Guiden ("Guiden Decl.") at 2.

13   Defendant similarly challenges the time involved in creating the source lists from the information in

14   Searcher.

15         For the following reasons, the Court agrees with the government that KFI response costs and

16   development costs are properly considered in the calculation of "actual loss" under the Guidelines.

17   However, the Court finds that the government has failed to satisfactorily prove the magnitude of

18   those losses it asserts.

19                                      **III.   DISCUSSION**

20         Sentencing under both the CFAA and EEA is governed by United States Sentencing

21   Guidelines Manual § 2B1.1.  *See* U.S.S.G. app. A.  Under § 2B1.1, courts are instructed to increase

22   the base offense level based on the amount of "loss."  U.S.S.G. § 2B1.1(b).  "Loss" is defined as the

23   "greater of actual loss or intended loss."  *Id.* § 2B1.1 cmt. n. 3.  "Actual loss," which is involved in

24   this case, means the "reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* at §

25   2B1.1 cmt. n.3(A)(I).  Harm is reasonably foreseeable if the "defendant knew or, under the

26   circumstances, reasonably should have known, [that the harm] was a potential result of the offense."

27   *Id.* § 2B1.1, cmt. n.3(A)(iv).

28

4

**United States District Court**
For the Northern District of California

1    "In calculating the amount of loss under the Guidelines, a sentencing court 'need only make

2    a reasonable estimate of the loss.'" *United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009)

3    (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)).  Accordingly, this Court is not required to make a loss

4    calculation with "absolute precision." *United States v. Laurienti*, 611 F.3d 530, 558 (9th Cir. 2010).

5    The Court's "reasonable estimate" of loss, "shall be based on available information" including,

6    among other things, the following factors:

7              (i)      The fair market value of the property unlawfully taken, copied,
                        or destroyed; or, if the fair market value is impracticable to
8                       determine or inadequately measures the harm, the cost to the
                        victim of replacing that property.
9
              (ii)     In the case of proprietary information (*e.g.*, trade secrets), the
10                      cost of developing that information or the reduction in the
                        value of that information that resulted from the offense.
11

12   U.S.S.G. § 2B1.1 cmt. n.3(C)(i), (ii).  As discussed below, costs of responding to the offense

13   incurred by the action are also a relevant factor under n.3(A)(v)(III).

14       In "calculating the amount of loss, the guidelines look not only to the charged conduct but to

15   all relevant conduct by the defendant." *United States v. Flonnory*, 630 F.3d 1280, 1286 (10th Cir.

16   2011).  Under the Guidelines, "relevant conduct" includes "all reasonably foreseeable acts and

17   omissions of others in furtherance of . . . jointly undertaken criminal activity" as well as "all acts and

18   omissions . . . that were part of the same course of conduct or common scheme or plan as the offense

19   of conviction."  U.S.S.G. § 1B1.3(a)(1), (2).  As a result, "[b]ecause relevant conduct may include a

20   broader range of conduct than the underlying conduct, a district court may 'properly consider[]

21   charged, uncharged, and acquitted conduct.'" *United States v. May*, 706 F.3d 1209, 1213 (9th Cir.

22   2013) (quoting *United States v. Peyton*, 353 F.3d 1080, 1089 (9th Cir. 2003)).  However, the

23   uncharged conduct must be criminal in nature.  *See United States v. Catchings*, 708 F.3d 710, 712

24   (6th Cir. 2013).  Where, as here, a defendant has been convicted of conspiracy, "[s]entencing

25   enhancements based entirely on the nature and extent of the conspiracy . . . do not require proof by

26   the clear and convincing standard" but rather require proof by a preponderance of the evidence.

27   *United States v. Jenkins*, 633 F.3d 788, 808 n.8 (9th Cir. 2011).

28

1    Finally, any costs incurred by a victim "primarily to aid the government in[] the prosecution

2 and criminal investigation of an offense" are expressly excluded from the loss calculation.  U.S.S.G.

3 § 2B1.1 cmt. n.3(D)(ii).

4 A.    KFI's Internal Investigation Costs Are Included in the Loss Calculation

5    The parties dispute whether, and to what extent, internal investigation costs may be included

6 in the Guidelines' loss calculation.  The government concedes that this question of whether internal

7 investigation costs may be considered a "loss" under the CFAA has not been addressed in a criminal

8 case.  Both parties also recognize that the CFAA's civil provision has a similar definition of loss and

9 that the cases construing this provision are split on this issue.  Ultimately, the Court finds that the

10 costs of an internal investigation taken in the wake of a CFAA offense may be considered in the loss

11 calculation.

12    The application notes to § 2B1.1 contain the following "rule of construction" for considering

13 pecuniary harm caused by a violation of 18 U.S.C. § 1830:

14    (III)    *Offenses Under 18 U.S.C. § 1030.*—In the case of an offense
under 18 U.S.C. § 1030, actual loss includes the following
15    pecuniary harm, regardless of whether such pecuniary harm
was reasonably foreseeable: any cost to any victim, including
16    the cost of responding to an offense, conducting a damage
assessment, and restoring the data, program, system, or
17    information to its condition prior to the offense, and any
revenue lost, cost incurred, or other damages incurred because
18    of interruption of service.

19 U.S.S.G. § 2B1.1 cmt. n.3(A)(v)(III).  Two things are facially apparent from this provision.  First,

20 whereas § 2B1.1 normally defines "actual loss" as "reasonably foreseeable pecuniary harm," Note

21 3(A)(v)(III) expands actual loss in § 1030 cases to include certain harm *regardless* of whether the

22 defendant could reasonably foresee them.  Second, Note 3(A)(v)(III) merely states that actual loss

23 "includes" the enumerated harm.  Thus, the Note is not an exhaustive list of the harm that may be

24 considered in the Guidelines calculation for § 1030 offenses.

25    Consistent with the parties' briefs, the Court has been unable to find a case which construes

26 Note 3(A)(v)(III), let alone one which sheds light on whether courts should include internal

27 investigation costs in the loss calculation.  However, the CFAA contains a similar definition of

28 "loss."  Under 18 U.S.C. § 1030(g), a person who suffers "damage or loss" by reason of a CFAA

**United States District Court**
For the Northern District of California

6

United States District Court

For the Northern District of California

1   violation may bring a civil suit against the violator to obtain compensatory damages.  The CFAA

2   then provides:

3              the term "loss" means any reasonable cost to any victim, including the
               cost of responding to an offense, conducting a damage assessment, and
4              restoring the data, program, system, or information to its condition
               prior to the offense, and any revenue lost, cost incurred, or other
5              consequential damages incurred because of interruption of service.

6   *Id.* § 1030(e)(11).  District courts have split on whether a victim's internal investigations may be

7   included within this definition.

8          On one hand, judges in this district have routinely held that such investigation costs are

9   included within the definition of § 1030(e)(11).  For example, in *SuccessFactors, Inc. v. Softscape,*

10  *Inc.*, 544 F. Supp. 2d 975 (N.D. Cal. 2008), plaintiff's competitor was alleged to have hacked into

11  plaintiff's website, downloaded information from secure areas of the site, and used that information

12  to create a powerpoint presentation critical of the plaintiff's integrity and business practices.  *Id.* at

13  977.  Defendant then sent this presentation to plaintiff's actual and prospective customers.  *Id.*

14  Plaintiff argued it had standing under the CFAA because the following activities took "many hours

15  of valuable time away from day-to-day responsibilities":

16             analysis of which restricted environments had been accessed (to
               determine the extent of breach); collection and analysis of IP
17             addresses accessing Plaintiff's network, to determine whether access
               was internal or hostile (to determine the appropriate response); and
18             review logs of documented users to confirm conclusions.

19  *Id.* at 980.  The court found that plaintiff had standing and noted that "where the offense involves

20  unauthorized access and the use of protected information, discovering who has that information and

21  what information he or she has is essential to remedying the harm."  *Id.* at 981.  It found that the

22  "cost of discovering the identity of the offender or the method by which the offender accessed the

23  protected information" would be deemed to be "part of the loss for purposes of the CFAA."  *Id.*; *see*

24  *also Farmers Ins. Exchange v. Auto Club Group*, 823 F. Supp. 2d 847, 855 (N.D. Ill. 2011)

25  (concluding that costs associated with "identifying and ascertaining the extent" of defendant's

26  unauthorized access could satisfy the CFAA's definition of loss).

27         Similarly, in *Mutiven v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887 (N.D. Cal. 2010), a former

28  employee of Cisco Systems formed a competing company and then sued Cisco alleging an unlawful

**United States District Court**

For the Northern District of California

1    monopoly and Cisco counterclaimed for a violation of the CFAA.  Cisco alleged that the former

2    employee had used another Cisco employee's passwords to access their system and then download

3    Cisco's proprietary and copyrighted software.  The court concluded that it is "not necessary for data

4    to be physically changed or erased" to constitute a loss or damage under the CFAA.  *Id.* at 894.

5    Rather, the court concluded:

6                  It is sufficient to show that there has been an impairment to the
                   integrity of data, as when an intruder retrieves password information

7                  from a computer and the rightful computer owner must take corrective
                   measures 'to prevent the infiltration and gathering of confidential

8                  information.'  Costs associated with investigating intrusions into a
                   computer network and taking subsequent remedial measures are losses

9                  within the meaning of the statute.

10   *Id.* at 895.

11           On the other hand, there is a body of case law narrowly construing CFAA's definition of

12   loss.  For example, in *Harley Automotive Group, Inc. v. AP Supply, Inc.*, No. 12-1110, 2013 WL

13   6801221 (D. Minn. Dec. 23, 2013), the court granted defendant's motion for summary judgment,

14   finding that the plaintiff had not offered evidence that it suffered a "loss" for purposes of the CFAA.

15   The plaintiff had asserted that it "had to expend resources to analyze its system so as to discover

16   how information was accessed."  *Id.* at *7.  The court found this insufficient and held that the CFAA

17   loss requirement was limited to "actual computer impairment."  *Id.* at *6.  As a result, because

18   plaintiff did not provide any evidence that its computer system was impaired or that its service was

19   interrupted, it had failed to demonstrate a CFAA loss.  *Id.* at *7; *see also Jarosch v. Am. Family Mut.*

20   *Ins. Co.*, 837 F. Supp. 2d 980, 1022 (E.D. Wisc. 2011) (holding that "to state a claim based on loss,

21   the loss must relate to the impairment or unavailability of data on a computer," and that "loss" does

22   not "include the cost of responding to a security breach").

23           The Court concludes that under § 2B1.1 and Note 3(A)(v)(III) "actual loss" includes those

24   costs incurred as part of an internal investigation reasonably necessary to respond to the offense, for

25   example by identifying the perpetrator or the method by which the offender accessed the protected

26   information.  *Cf. United States v. Middleton*,  231 F.3d 1207 (9th Cir. 2000) (affirming use of a jury

27   instruction in a CFAA case which defined loss, in part, as costs "reasonably necessary to resecure

28   the data, program, system, or information from further damage").  The Court reaches this conclusion

**United States District Court**

For the Northern District of California

1   for two reasons.  First, the plain language of Note 3(A)(v)(III) and § 1030 itself both include in the

2   definition of loss the cost of generally "responding to an offense."  In addition to this general

3   statement, both provisions then expressly state that (1) conducting a damage assessment; (2)

4   restoring data or a system to its prior condition; or (3) lost revenue resulting from any interruption of

5   service all qualify as "loss."  If, as the cases which narrowly construe loss suggest, "loss" required

6   some actual damage to a computer system or data, the phrase "responding to an offense" would be

7   rendered superfluous by the more specific provisions.

8       Second, in situations where the CFAA violation constitutes covert, unauthorized access into

9   a computer system, taking corrective actions or otherwise "responding to an offense" will often be

10   difficult (if not impossible) until the victim knows (1) who perpetrated the offense; (2) how the

11   offense was perpetrated, and (3) the scope of any resulting damage or the degree to which the

12   integrity of its data has been compromised.  *See SuccessFactors*, 544 F. Supp. 2d at 981.

13   Individuals who access a computer without authorization and with an intent to defraud are unlikely

14   to announce their presence, inform the victim what information they have accessed, and advise the

15   victim on how it could protect itself in the future.  *See* 18 U.S.C. § 1030(a)(4).  Rather, an internal

16   investigation will often be necessary to determine these critical facts.   The very purpose of the

17   "loss" enhancement to a Guideline offense level is that the reasonably foreseeable loss caused by an

18   offender's actions represents a proxy for that offender's culpability.  *See United States v. Parsons*,

19   141 F.3d 386, 392-93 (1st Cir. 1998).  Determining who breached the system security and the

20   manner and extent of the intrusion, is a reasonable and foreseeable step a victim is expected to take

21   in response to a CFAA violation;  it may well inform what remedial steps need be taken, steps which

22   are clearly cognizable as losses under the CFAA.  In *Middleton*, *supra*, the Ninth Circuit held that

23   costs in resecuring data, program, system or information from further damage constitutes loss under

24   the CFAA.  It would be inconsistent with the purpose of the § 2B1.1 to absolve a defendant of

25   culpability for these reasonably foreseeable costs including investigatory costs to determine the

26   nature and scope of the offense for the reasons stated above.

27       This is not to say that there are not limits to the investigative costs that can be used to

28   enhance a sentence.  For example, as discussed above, the Ninth Circuit in *Middleton* at least

**United States District Court**

For the Northern District of California

1    implied that the victim's response costs must be "reasonably necessary."  There may be instances

2    where a victim has the information necessary to take corrective action without the need of an

3    extensive investigation.  Additionally, because the CFAA gives victims a civil remedy, it is likely

4    that at some point, a victim's actions will shift away from responding directly to an offense and

5    toward building a civil case against the offender.  Costs incurred for the purpose of building or

6    supporting the victim's civil case should not be considered "loss" for purposes of the Guidelines

7    calculation.  *Cf. Brooks v. AM Resorts, LLC*, — F. Supp. 2d — , 2013 WL 3343993 (E.D. Pa. July 3,

8    2013) (holding "litigation costs are not a compensable loss under the CFAA because they are not

9    related to investigating or remedying damage to the computer"); *Mintel International Group, Ltd. v.*

10   *Neergheen*, No. 08-cv-3939, 2010 WL 145786 (N.D. Ill. Jan. 12, 2010) (holding that costs incurred

11   in retaining an expert to assist with civil litigation may be a "legitimate business concern, it does not

12   transform any harms allegedly suffered by Mintel into 'losses' under the CFAA").

13       In light of the above, the Court finds that some, but not all, of KFI's internal investigation

14   costs are properly included in the loss calculation under § 2B1.1.  First, the Court excludes from the

15   loss calculation the time spent by Mr. Dan Demeter and Mr. Paul Dunn from May 2005 through July

16   2005.  The government asserts that between these months, Mr. Demeter, KFI's former Chief

17   Information Officer, spent approximately 180 hours between May and July 2005 investigating

18   Defendant's thefts from KFI .  Gov. Supp. Memo. at 12.  Given Mr. Demeter's hourly rate, the

19   government asserts that his time spent on the internal investigation adds $61,600 to the loss

20   calculation.  *Id.* at 11.  Unfortunately, Mr. Demeter had a major stroke in August 2010 and the

21   government has been unable to support these estimates with a declaration from Mr. Demeter which

22   describes what actions he took to investigate Mr. Demeter's and how long he spent on these various

23   actions.  Rather, the government has arrived at an estimate of Mr. Demeter's time by relying on Ms.

24   Briski who looked at Mr. Demeter's emails and Outlook calendars between May and July 2005 to

25   arrive at a "very conservative" estimate of his time.  Briski Decl. ¶¶ 22-24.  Thus, the government is

26   relying upon hearsay upon hearsay to arrive at this estimate.  "[H]earsay is admissible at sentencing,

27   so long as it is 'accompanied by some minimal indicia of reliability.'"  *United States v. Littlesun*,

28   444 F.3d 1196, 1200 (9th Cir. 2006).

**United States District Court**

For the Northern District of California

1    Here, the Court finds that the government has failed to make this minimal showing.  Mr.

2  Briski's description of Mr. Demeter's time is too general and the government did not seek to

3  introduce the documents upon which Ms. Briski relied on making this estimate.  As a result, the

4  Court cannot determine the nature of Mr. Demeter's actions, whether those actions satisfy the

5  standard articulated above, and whether these actions were reasonable (particularly in light of the

6  investigatory actions being conducted by Ms. Briski during the same time period).  Accordingly, the

7  Court will not consider Mr. Demeter's time in arriving at the loss calculation.

8    For similar reasons, the Court declines to include the time spent by Mr. Peter Dunn (KFI's

9  General Counsel) between the months of May and July 2005.  While Mr. Dunn has submitted a

10  declaration which estimates the time he spent during these months, it is far too general for the Court

11  to determine if his actions are cognizable as a loss for purposes of the Guidelines calculation.

12  Specifically, his declaration states that:

13    During each of May, June and July 2005, I estimate that I spent
      approximately 60 hours per month, for a total of 180 hours, working
14    with Korn/Ferry employees, outside counsel, and investigators
      retained by Korn/Ferry to investigate theft of data from Korn/Ferry by
15    Nosal, Jacqueline Froehlich-L'Heureaux, Becky Christian, and Mark
      Jacobson.

16

17  Declaration of Peter Dunn ("Dunn Decl.") ¶ 4, Dkt. No. 477.  This description suffers from two

18  defects.  First, the Court is unable to determine whether Mr. Dunn's activities were in fact

19  investigating the who, what, and how behind Defendant's offenses as opposed to preparing for civil

20  litigation, which would not be included for the reasons discussed above.  Second, Mr. Dunn

21  acknowledges that "[s]ince July 2005 to the present, I have assisted the government in its

22  investigation and subsequent prosecution of Nosal."  *Id.* ¶ 6.  However, Mr. Dunn does not attempt

23  to apportion the 60 hours he spent in July between his assistance in the *government's* investigation

24  and his participation in KFI's *internal* investigation.  This is significant because costs incurred by a

25  victim with the primary purpose of  aiding the government's investigation are not included under  §

26  2B1.1.  *See* U.S.S.G. § 2B1.1 cmt. n.3(D)(ii).  The government seeks to account for this by including

27  only half of the time Mr. Dunn (and Ms. Briski's) spent on these activities in July.  Gov. Supp.

28  Memo. at 9.  However, at the hearing, the government candidly admitted that it had no basis, beyond

**United States District Court**

For the Northern District of California

1   its own judgment, for drawing the line at half.  The Court declines to allow such speculative

2   estimates to be included in the loss calculation.  *See, e.g.*, *United States v. Dominguez*, 109 F.3d 675,

3   676 (11th Cir. 1997) (the district court "must not speculate concerning the existence of a fact which

4   would permit a more severe sentence under the guidelines").

5          However, the Court will include time spent by Ms. Briski investigating Defendant's actions

6   in May and June 2005 in the Guidelines loss calculation.  In May 2005, Ms. Briski asserts that she

7   spent approximately 80 hours

8                  downloading reports of Searcher activity for individuals with
               connections to Nosal whom Korn/Ferry believed were the most likely
9              candidates to be assisting Nosal in making intrusions into Searcher, as
               well as monitoring Searcher, and analyzing their activity on Searcher.
10             As part of this work, [she] prepared various charts and graphs
               regarding Searcher activity . . . .  [She] also worked to develop and
11             implement additional audit capabilities in the Searcher database that
               allowed Korn/Ferry to capture additional information regarding
12             queries run and other Searcher activity by individuals using Searcher.

13  Briski Decl. ¶ 7.  Ms. Briski continued these activities for 120 hours in June 2005.  *Id.* ¶ 8.  The

14  Court finds these actions are appropriate response costs directed at determining the identity of those

15  individuals involved in the intrusion into KFI's system, the scope of that intrusion, and the remedial

16  actions that should be taken.  Conversely, the Court will not include the time Ms. Briski spent in

17  July 2005.  In her declaration, Ms. Briski states that her work in July 2005 "included assisting with

18  preparing for potential civil litigation and arbitration."  *Id.* ¶ 9.  As discussed above, such litigation

19  focused activities are not properly considered in the loss calculation.  Ms. Briski does not seek to

20  estimate what portion of her time in July 2005 was spent *investigating* (which can be included) and

21  what portion was spent *preparing* for litigation (which cannot).  Accordingly, because the

22  government has provided nothing in the record which would permit the Court to determine where

23  this line should be drawn as to the July activities of Ms. Briski, the Court will not consider Ms.

24  Briski's July 2005 time.  *See Dominguez*, 109 F.3d at 676.

25         In sum, the Court finds that KFI's costs associated with its internal investigations into

26  Defendant's actions will be included in the loss calculation under  § 2B1.1.  Because the Court

27  concludes that the government has only demonstrated that Ms. Briski's May and June 2005 activities

28  are properly included, the Court finds that **$27,400** will be included in the loss calculation

United States District Court

For the Northern District of California

1   (representing the 200 hours Ms. Briski spent over these 2 months multiplied by her estimated $137

2   hourly rate which properly includes her base salary, bonuses and benefits – incremental costs

3   associated with her employment, and excludes fixed costs such as company overhead).

4   B.       Development Costs of the Stolen Source Lists Is Properly Included in the Loss Calculation

5           In addition to the $27,400 in investigation costs discussed above, the Court finds that the

6   development costs of KFI's source lists will be included in the loss calculation.  As discussed, under

7   U.S.S.G. § 2B1.1, one of the factors the court should consider in a case involving trade secrets is

8   "the cost of developing that information or the reduction in the value of that information that

9   resulted from the offense."  *Id.* § 2B1.1 cmt. n.3(C)(ii).  Thus, in *United States v. Ameri*, 412 F.3d

10  893 (8th Cir. 2005), the Eighth Circuit upheld a $1.4 million loss calculation in a case involving

11  theft of trade secrets, finding the development cost of the software at issue was $700,000 (the

12  defendant had made two copies of the software).  *Id.* at 900.

13          As an initial matter, the Defendant argues that the *only* source lists which can form the basis

14  of a cognizable loss are those associated with Counts Two, Five and Six – representing 374 names.

15  The Court disagrees.  As discussed above, sentencing courts may consider all "relevant conduct" in

16  imposing sentence, including "all acts and omissions . . . that were part of the same course of

17  conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(1).  In

18  addition, the court may consider the acts or omissions committed by *others* that were "in furtherance

19  of . . . jointly undertaken criminal activity."  *Id.*; *see also Treadwell*, 593 F.3d at 1004 (recognizing

20  that under § 1B1.3, the Court must determine the "scope of each defendant's joint undertaking and

21  the amount of losses reasonably foreseeable to each defendant").

22          Defendant was convicted of conspiracy to misappropriate KFI's trade secrets.  Further,

23  Defendant was not a mere participant in the conspiracy, but rather was instrumental in organizing

24  and directing the conspiracy.  Accordingly, the Court finds that the government, through evidence at

25  trial and at sentencing, as shown by a preponderance of the evidence that the misappropriation of the

26  following executive information contained in source lists was within the scope of the conspiracy and

27  reasonably foreseeable to the Defendant:

28

13

**United States District Court**
For the Northern District of California

1        •       The 349 executive names and information contained in
                 Government Exhibit 58.

2

3        •       The 85 executive names and information from the source list
                 contained in Government Exhibit 43.

4        •       The 25 executive names and information contained in
                 Government Exhibit 60 and cut and pasted from a source list.

5

6        •       The 2,784 executive names and information downloaded by
                 Becky Christian in the fourth quarter of 2004 and described in
                 Government Exhibit 23.

7

8        •       The 2,406 executive names and information contained in
                 Government Exhibit 47.

9   Accordingly, in determining the loss occasioned by Defendant and his coconspirator's theft of KFI's

10  trade secrets (the source lists), the Court will consider the development cost of placing the names

11  and information of 5,649 executives into source lists.  Briski Decl. ¶ 35.  Because the Court is

12  focused on determining the development cost of the source lists, it will not include in the loss

13  calculation the 450 names which Defendant and his co-conspirators obtained from the Searcher

14  database but which were not placed into source lists.

15         Defendant and the government spend the majority of their memoranda disputing the time

16  necessary to actually create the source lists as well as the hourly rate of KFI personnel.  Ms. Briski's

17  estimate of the development cost of the source lists is composed of two components – the time

18  required to enter executives' information into FKI's Searcher database and the time required to

19  actually create source lists from the information in the Searcher database.  As to the former, Ms.

20  Briski estimated that a standard KFI research associate "could typically generate contact information

21  for two to four executives worthy of inclusion in Searcher per hour."  *Id.* ¶ 37.  She then estimates

22  the hourly rate of a research associate at $150.00 an hour (which includes their compensation,

23  benefits, and overhead).  *Id.*  From this, she estimates that it cost between $152,475.00 (6,099

24  names, multiplied by .25, multiplied by $150.00) and $457,425.00 (6,099 names, multiplied by .5,

25  multiplied by $150.00) for KFI research associates to place 6,099 names into the Searcher database.

26  *Id.*

27         Ms. Briski then estimates the amount of time (and thus the cost to KFI) of placing 5,649

28  names from the Searcher database into source lists.  Ms. Briski estimates, based on her experience at

**United States District Court**

For the Northern District of California

1  KFI, that a "conservative estimate of the time it takes to conduct the work required to locate and

2  initially evaluate an individual candidate for inclusion on a source list . . . is an average of .25 to .33

3  of an hour (i.e., three to four executives per hour)." *Id.* ¶ 41.  Further, she states that a Senior

4  Associate in 2005 cost KFI between $200 and $250 per hour.  *Id.*  Accordingly, Ms. Briski estimates

5  that the cost of finding the 5,649 executives whose information was contained in the

6  misappropriated source lists was between $282,450.00 (5,649 names, multiplied by .25, multiplied

7  by $200.00) and $466,042.50 (5,649 names, multiplied by .33, multiplied by $250.00).  *Id.*  As a

8  result, Ms. Briski estimates that the total development cost of the source lists at issue is between

9  $434,925.00 and $923,467.50.  *Id.*  ¶ 42.

10       The Court declines to adopt Ms. Briski's estimate as to the development costs of the source

11  lists.  The Court is concerned that Ms. Briski's estimates appear to assume that each of the 5,649

12  names on the source lists were obtained via individualized effort and manual entry and fails to

13  consider the extent to which economies of scale may have expedited the process.  Defendant has

14  proffered evidence, and the government does not contest its validity, that KFI personnel were able to

15  import or copy over information regarding multiple executives (either from commercially available

16  sources or prior search lists) into its database and source lists.  Significantly, the Defendant's

17  evidence includes the creation of portions of source lists that are at issue in this case which

18  demonstrate the speed by which some lists may be compiled.  For example, the Defendant has

19  introduced evidence that in a single day, Larry Ormsby of KFI added 45 names into the Perkin

20  Elmer P2 source list (one of the source lists involved in this case).  Under Ms. Briski's estimates,

21  this should have taken Mr. Ormsby between 11 and 15 hours.  The Court finds it unlikely that Ms.

22  Ormsby spent this period of time on 45 names in a single day.  Similarly, Defendant has offered a

23  declaration by Kristin Speer, a former KFI employee who was involved in the creation of the Perkin

24  Elmer P1 source list.  She estimated that it took her approximately 18.8 hours to place 218 names on

25  this list – approximately 5 minutes per name.  *See* Declaration of Dennis P. Riordan, Ex. A, Dkt. No.

26  489-2; Declaration of Kristin Speer ("Speer Decl."), Dkt. No. 499-3.

27       The government is correct that it need only provide a "reasonable estimate" of the loss.

28  However, given the state of the record, the Court adopts a conservative approach and applies the 5

**United States District Court**

For the Northern District of California

1 minute per name figure contained in the Speer Declaration.  Accordingly, the Court estimates that

2 the development of the source lists involved in this case took 470.75 hours (5,649 names multiplied

3 by 5 minutes and then divided by 60 minutes).

4      The parties also contest what hourly rate should apply.  Ms. Briski estimates that senior

5 associates in 2005 – the least expensive KFI personnel involved in the creation of the source lists –

6 have hourly rates of between $200 and $250 an hour when you include benefits, compensation, and

7 overhead.  Briski Decl. ¶ 41.  Assuming a 2080 hour work year, this hourly rate yields places the

8 yearly cost of a senior associate at $416,000.  By contrast, Ms. Speer states in her declaration that

9 she made $86,190 in 2005.  Speer Decl. ¶ 2.  This figure yields an hourly rate of $41.44.  It appears

10 that the main difference between Ms. Speer's and Ms. Briski's hourly estimate is Ms. Speer's

11 omission of benefits and administrative overhead in her account of her 2005 salary.

12      The government cites the case of *United States v. Sablan*, 92 F.3d 865 (9th Cir. 1996), for the

13 proposition that the victim's overhead is properly considered in the calculation of loss.  In that case,

14 a former employee of a bank broke into the bank after it was closed, logged onto the computer

15 system and severely damaged several files that required numerous hours of computer programming

16 to fix.  *Id.* at 866.  The Ninth Circuit concluded that in calculating the cost of repairs for purposes of

17 the loss calculation, the district court properly used the bank's standard hourly rate for its

18 employees' time, computer time, and administrative overhead.  *Id.* at 869-70.  Specifically, the court

19 found that "had it not been necessary for the bank to devote its employees' time and computer time

20 to making these repairs, the administrative overhead and profit would have been paid to the bank by

21 its normal customers." *Id.* at 870.  Thus the Ninth Circuit found that on those facts "[t]he utilization

22 of the normal bank charges in valuation of the loss was a *reasonable* approach by the district court."

23 *Id.* (emphasis added).

24      Notwithstanding the reasonableness of the approach in *Sablan*, the Court declines to consider

25 KFI's overhead costs in the development cost estimate.  In *Sablan*, the devotion of employee and

26 computer time – time that otherwise could have been spent assisting customers – was a direct result

27 of the defendant's conduct.  Here there is no connection between the Defendant and his co-

28 conspirator's offenses and the development cost of the source lists.  Stated another way, KFI would

16

United States District Court

For the Northern District of California

1  have incurred its overhead costs regardless of whether the source lists in this case were created.  In

2  short, overhead costs are not proximately related of the offenses committed.  Accordingly, the Court

3  concludes that overhead costs should not be included on the facts of this case and will adopt the

4  conservative $41.44 figure found in Ms. Speer's declaration.

5      Accordingly, the Court finds that a conservative, and reasonable, estimate of the source lists'

6  development cost is **$19,507.88**.

## IV.    CONCLUSION

8      For the foregoing reasons, the Court finds that, based on the record before the Court, a

9  reasonable estimate of the actual harm suffered by KFI is **$46,907.88**.  This represents $27,400 in

10  KFI's response costs and $19,507.88 in development costs of the misappropriated source lists.

11

12      IT IS SO ORDERED.

13

14  Dated:  January 13, 2014

15  _____
    EDWARD M. CHEN
16  United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28